IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

AJE Enterprise LLC d/b/a
Whisper Night Club and Lounge, et al.,
                    Plaintiffs,

v.                                                             Case No. 1:20-cv-00229-JPB

James Justice, in his capacity as
Governor of West Virginia, et al.,
                    Defendants.

**Defendants City of Morgantown and Emily Muzzarelli's**
**Response in Opposition to Plaintiffs' Motion for Preliminary Injunction**

Introduction

The entire world is dealing with a catastrophic public health emergency created by a highly contagious and deadly new virus, COVID-19, which has rapidly spread across the planet from Wuhan, China, in the months since December 2019.

The worldwide COVID-19 death toll of over a million souls and counting is staggering. The State of West Virginia, Monongalia County, and the City of Morgantown have not been spared. Elected leaders in West Virginia and across the United States have been required to respond to the pandemic. States of Emergency have been declared by the Federal government and by state and local authorities in order to implement emergency public health measures designed to slow the spread and mitigate the deadly toll of the Covid-19 pandemic until effective vaccines can be developed and produced.  That day has not yet come.

While the emergency public health measures have been partially effective in slowing the COVID-19 pandemic, the virus continues to sicken and kill at an alarming rate while disrupting essential businesses, governmental services, and everyday life. Emergency public health measures are still required to combat the pandemic and keep the economy functioning.

Each of the plaintiffs allege they own and/or operate bars in Monongalia County, West Virginia and that they have been subject to a series of Executive Orders issued by Governor Justice limiting their operations.  Most, but not all of the plaintiffs, own and/or operate bars within the City of Morgantown and have also been subject to Emergency Ordinances adopted by Morgantown City Council and the Emergency Orders of the City Manager implementing the ordinance authorities and limiting their operations during the COVID-19 public health emergency.[1]

Plaintiff's do not challenge the continued existence of a Public Health Emergency or the scope and severity of the COVID-19 pandemic in their pleadings. Nor do they argue their businesses provide essential goods and services to the public during the pandemic.

Monongalia County Health Department ("MCHD") contact tracing within Monongalia County and studies of COVID-19 exposure risks by the Center for Disease Control ("CDC") and other public health researchers point to bars as high-risk environments for the transmission of the COVID-19 virus.  Municipal authorities in a university town must pay particular attention to the risk bars present to the larger community in the context of a pandemic involving the transmission of a deadly virus through physical contact and aerosol transmission.   Limiting bar operations is part of the interim solution to mitigation of the toll of the pandemic until effective vaccines can be developed and deployed.

---

[1] Plaintiffs who have been identified as owning and/or operating bars outside the city limits of the City of Morgantown include: (1) Carriba Foods, LLC d/b/a Crab Shack Carriba and Dockside Grill (Bron Kayal); (2) SAR Tech LLC, trade name "The Mason Jar Saloon and Hot Spot" operating at 1387 Fairmont Road, Morgantown, West Virginia ; (3) SHC LLC, tradename "Mason Jar BBQ & Catering" operating at 1387 Fairmont Road, Morgantown, West Virginia; and (4) Ray G Scorers d/b/a Scorers operating a at 201 Holland Ave., Westover, WV.

Injunctive relief should be denied because the Governor's Executive Orders limiting the operations of bars in Monongalia County lawfully exercise the emergency public health authorities granted by the West Virginia legislature under *W. Va. Code* §15-5-1 *et seq*., and because those orders are rationally related to a legitimate state purpose and are narrowly tailored to further a compelling state interest. Likewise, the Emergency Ordinances enacted by the City of Morgantown and implemented through the Emergency Orders of the Interim City Manager are necessary public health measures designed to mitigate the COVID-19 pandemic which the City of Morgantown is authorized to enact under *West Virginia Code* § 8-12-5, ¶¶ 23, 40, 44 and 58.

While the bar areas of plaintiffs' bars were limited to take-out for sales of food and drinks under Executive Order 65-20 issued September 2, 2020, Complaint Ex. 37,  and continuing in effect at the time their complaint was filed,[2] Governor Justice subsequently announced his intention to issue an Executive Order permitting Monongalia County bars to reopen for business at 50% occupancy with on-premises consumption of food and beverages on October 13, 2020. Executive Order No. 75-20 permitting Monongalia County bars to reopen for business at 50% occupancy with on-premises consumption of food and beverages was issued effective October 13, 2020, along with the Governor's "Supplemental Protocols for Reopening Monongalia County

---

[2]  Executive Order 65-20, Complaint Ex. 37, provided, in part:

 1. That all bars in Monongalia County shall not allow on-premises consumption of food or drink or occupancy by the general public for purposes other than picking up to and/or drink from such establishment be taken away.

2. The tables and seats at bar tops within "bar areas" of restaurants, hotels, and other similar facilities may be used for general seating for dining, subject to the same limitations as are in place for restaurants, including without limitation the requirement to maintain adequate social distancing.

3. But the provisions of this Order supersede any conflicting provisions of Section 3.c of Executive Order 9-20, as amended, only with respect to the operation of bars and bar areas of establishments in Monongalia County.

Bars[3]," issued August 19, 2020, and again made effective by adoption of Executive Order 75-20. Executive Order 75-20 and the Supplemental Protocol are attached as **Exhibit 1.** The Executive Orders which Plaintiffs allege caused the closure of their bar businesses and the Morgantown Emergency Ordinances and City Manager Orders[4] prohibiting the on-premises sale of food and beverage in bars located in the city limits of Morgantown have been amended to permit bar operations at 50% occupancy.  Accordingly, the request for injunctive relief is largely moot.  If the Court considers the request for injunctive relief, the request must be denied because the regulations are based on medical guidance and are designed to prevent the infection and death of community members who may otherwise be unnecessarily exposed to COVID-19.

<u>Legal Standard</u>

**A.  Injunctive Relief**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24, 129 S. Ct. 365 (2008) (internal citations omitted); *see also Dewhurst v. Century Aluminum Co*., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction ... must clear[ly] show[ ] that it is likely to succeed on the merits."  (alterations in original) (internal citation and quotation marks omitted)). In order to receive a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed

---

[3] The Supplemental Protocols require that "bars and bar areas within restaurants, hotels, and other similar facilities shall:
- Strictly enforce a maximum indoor occupancy of 50% of seating capacity;
- Restrict entrance to those who are 21 years of age or older;
- Close and restrict access to dance floors; and
- Prohibit any indoor live performance or entertainment.
*Id*.
[4] City of Morgantown Emergency Ordinance No. 2020-5, and the City Manager order implementing authority granted therein, as applied to Plaintiffs, simply mirrored the Governor's Executive Order 65-20 and established penalties for violations of the order.

on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest.  *Winter*, 555 U.S. at 20, 129 S. Ct. 365.  Each of these four requirements must be satisfied. *Id;  Mountain Valley Pipeline, LLC v Western Pocahontas Properties Limited Partnership,* 918 F.3d 353 at 366 (4th Cir. 2019) (Followed in *Sturgeon v City Manager of Wheeling*, USDC NDWV No. 5:20-cv-00192, Unpublished Order, September 16, 2020).

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (*quoting Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Although Plaintiffs "need not establish a 'certainty of success,'" they must "make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (*quoting Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)); *Roe v United States Department of Defense*, 947  F. 3d_207, 219 (4th Cir 2020).

The test for the issuance of a preliminary injunction turns on the balance of the four Winter factors: likelihood of success on the merits; irreparable harm in the absence of an injunction; equities to the parties; and, the public interest.  *Id*.

Plaintiffs have the burden of proof on each factor. *Winter,* 555 U.S. at 20. Additionally, a plaintiff must show that success on the merits is likely "regardless of whether the balance of hardships weighs in his favor." *The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346

(4th Cir. 2010), *vacated on other grounds*, 559 U.S. 1089 (2010). This burden requires more than simply showing that "grave or serious questions are presented." *Id*. at 347.

The Plaintiffs' request for injunctive relief, and their likelihood of success on the merits, is dependent on their ability to establish they are likely to succeed in proving  the defendants' public health emergency measures do not serve a legitimate state interest in the context of the worst worldwide pandemic since 1918.

<u>Statement of Facts</u>

In December 2019, a novel (new) coronavirus known as SARS- CoV- 2 ("COVID-19" or "the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally. The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19. On March 13, 2020, President Trump declared a National Emergency as a result of the COVID-19 pandemic. See, "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, March 13,2020.[5, 6]

Effective March 16, 2020, Governor Justice declared a state of emergency in all fifty-five West Virginia counties as a result of the COVID-19 pandemic. Complaint Exhibit 2.  On March 23, 2020, Governor Justice issued Executive Order 9-20, denominated the "Stay at Home" Order,

---

[5]   https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ **Exhibit 2**, attached.

[6] On January 30, 2020, the Director General of the World Health Organization, Dr. Tedros Adhanom Ghebreyesus, issued a formal statement in which he declared "a public health emergency of international concern over the global outbreak of novel coronavirus." https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov) **Exhibit 4**, attached.

ordering citizens to stay at their residences unless an exception permitted travel. Complaint Exhibit 7.  In the period since March, 2020, nearly every state has issued multiple Executive Orders to address the COVID-19 pandemic to protect public health.[7] Morgantown Emergency Ordinance 2020-1, adopted March 17, 2020, recognized a public health threat in connection with the COVID-19 pandemic and declared a State of Emergency in the City of Morgantown for a period of ninety (90) days. **Exhibit 3** attached.

On April 4, 2020, Governor Justice issued Executive Order 21-20, Complaint Ex. 10, expanding the restrictions in the Stay at Home Order in Harrison, Kanawha, and Monongalia Counties and granting additional authorities to the Health Departments in these counties to impose measures restricting gatherings and travel to respond to the COVID-19 pandemic.  Executive Order 21-20 designated Monongalia County as a "hot spot" due to the prevalence of COVID-19 infections relative to other areas of the state and imposed restrictions limiting outdoor gatherings to no more than five people and requiring essential businesses to have employees work remotely to the maximum extent possible.

Executive Order 32-20, issued by Governor Justice April 30, 2020, Complaint Ex. 17, modified operating restrictions on restaurants to permit on-premises outdoor sales of food. Executive Order 40-20, Complaint Ex. 24., issued by Governor Justice May 22, 2020, modified operating restrictions on bars and restaurants to permit 50% indoor occupancy of restaurants and bars for the sale of food and drinks.

Morgantown Emergency Ordinance 2020-2 adopted May 19, 2020, provided that the State of Emergency for the COVID-19 pandemic would continue within the City until the declaration of a State of Emergency is terminated by the Governor or the Emergency Ordinance lapsed without

---

[7] See, https://web.csg.org/covid19/executive-orders/  (Last visited 10/13/2020).

further action by the City on September 25, 2020. During the effective period of Emergency Ordinance 2020-2, the City Manager was authorized and directed to implement by written order all appropriate and necessary measures authorized by this Ordinance to address the COVID-19 pandemic, consistent with the advice and direction of City Council. **Exhibit 5** attached.

On July 1, the Monongalia County Health Department ("MCHD") issued a press release quoting the County Health Officer, Dr. Lee Smith, regarding contact tracing involving COVID-19 exposures in Morgantown bars. The press release stated in part:

> *MCHD is dealing with several positive COVID-19 cases of individuals who patronized bars*
>
> MORGANTOWN, WV (July 1, 2020) — Monongalia County Health Department is currently conducting disease investigation and contact tracing with individuals who visited several downtown bars, including one that has been connected to an outbreak.
>
> "We do not know where these individuals originally came into contact with COVID-19, but we do know that they spent time in at least three bars, if not more, and two of which they described as being "very crowded," said Dr. Lee B. Smith, MCHD executive director and county health officer.
>
> The evening of Wednesday, June 24, was a popular time that these bars were frequented. The bars include Baby Squirrels Saloon, Big Times and The Back Door, all located on High Street in downtown Morgantown. Four of the individuals visited Baby Squirrels on Wednesday; three cases constitute an outbreak.
>
> …
>
> This scenario has emerged in several spots all over the country as many states have experienced a rise in cases. Some of these have been connected to young people going out to crowded places and not necessarily observing the recommended precautions to avoid COVID-19. These include wearing a mask, maintaining a social distance of six feet and washing hands often and thoroughly.

**Exhibit 6** attached.

On July 5, 2020 a second MCDH press release was issued.

*COVID-19 cases spike in Monongalia County; up 61.7% in past five days*

MORGANTOWN, WV (July 5, 2020) — Monongalia County has seen 100 new cases of COVID-19 since the morning of July 1, a 61.7% increase in diagnosed positive cases that now total 262. The number of new COVID-19 cases in the past five days accounts for 38.2% of all cases recorded in Monongalia County since the first positive case was announced on March 19.

…

"These cases are from restaurants and bar staff, as well as gyms and fitness centers, vacations, barbecues and travel-related exposures."

On Wednesday, July 1, there were 162 reported diagnosed cases in Monongalia County, accumulated since March 19. Since July 1, numbers began increasing significantly. Cases went up by four on July 1; 16 on July 2; 14 on July 3; 29 on July 4 and 37 on July 5.

Also, there are additional cases expected to be confirmed.

…

"Our staff is overwhelmed," Dr. Smith said. "We are having difficulty in contacting all positive cases to notify them of the need for isolation, and we are falling behind in informing contacts who have been exposed and their need for quarantine."

As Dr. Smith noted, "These are necessary steps intended to break the cycle of widespread infection."

The largest numbers of positives are seen in the 20-30-year-old age group, Dr. Smith said.

Because of the spike in cases, Monongalia County Health Department (MCHD), which is now in week 15 of COVID-19 response, will be returning to a seven-days-a-week work schedule, Dr. Smith added.

…

"It is unreasonable to believe that this is nothing more than a flu, as hospitalizations are also increasing," Dr. Smith said. "There are reports from across the country of young people sustaining heart disease and even death. We are asking people of the county to assist in reducing widespread illness by observing basic precautions."

Also, MCHD needs additional contact tracers and is requesting that anyone who has been trained in this field who could provide volunteer services to please call 304-598-5100.

…

**Exhibit 7** attached.

On July 13, 2020, Governor Justice issued Executive Order No. 52-20, Complaint Ex. 32,

reinstituting a prohibition of on-premises sale of food or drink in bars in Monongalia County and

limiting occupancy of bars for purposes other than picking up food and/or drink for a period 10 days. A series of Executive Orders followed which, collectively, extended the prohibition against on-premises sales of food or drink by bars in Monongalia County until August 31, 2020, i.e., 55-20, Complaint Ex. 33; 58-20, Complaint Ex. 34; 60-20, Complaint Ex. 35; and 62-20, Complaint Ex.36.

The City of Morgantown reacted to the surge of COVID-19 cases which followed the partial reopening of bars and restaurants in June with the passage of Emergency Ordinance No. 2020-3 on July 13, 2020. The ordinance continued the state of emergency in Morgantown until the declaration of the state of emergency by Governor Justice is terminated, or until the effective period of the ordinance lapses on December 15, 2020, required face mask use by persons nine years of age and older outside the home in public settings and in businesses where social distancing was not possible, and required limited closures of businesses in the city for cleaning and MCHD inspection in the event a business had three or more positive cases among employees or customers. Emergency Ordinance No. 2020-3 is attached as **Exhibit 8**.  Authorities granted by Emergency Ordinance No. 2020-3 were implemented by an Order of the City Manager issued July 14, 2020 which became effective on July 15, 2020.  **Exhibit 9** attached.

On July 21, 2020, the City of Morgantown passed Emergency Ordinance No. 2020-4 clarifying the mask requirement and limitation on gatherings, suspending inspection of rental units, and authorizing suspension of evictions. Emergency Ordinance 2020-4 carries an expiration date of December 15, 2020. **Exhibit 10** attached. It was implemented by an Order of the City Manager dated July 28, 2020. **Exhibit 11** attached.

From a public health perspective, the reopening of bars in Morgantown on August 31, 2020, was not a success. Unmasked patrons far in excess of the 25-person gathering limit queued

outside the bars while paying little heed to social distancing.



## Gov. Justice: Mon. County bars closed at 4 PM





by: John Lynch
Posted: Sep 2, 2020 / 01:37 PM EDT / Updated: Sep 2, 2020 / 01:37 PM EDT

https://www.wtrf.com/news/health/coronavirus/gov-justice-mon-county-bars-closed-at-4-pm/
(Last accessed 10/14/2020)

Inside the bars, MCHD sanitarians observed patrons who were unmasked to eat and drink remaining in close proximity thereby increasing the risk of transmission of COVID-19.  The MCHD commented on the observations of their sanitarians in a September 2, 2020 press release.

>   *MCHD and WVABCA issue citations after visiting bars this weekend*
>
>   MORGANTOWN, WV (Sept. 2, 2020) — Two Monongalia County Health Department registered sanitarians spent an evening on the town this past weekend, along with five agents from the West Virginia Alcohol and Beverage Control Administration (WVABCA), a West Virginia State Police corporal and three troopers as well as representatives from Morgantown Police and the city's Fire Marshal division to make sure bars were not serving alcohol without food and adhering to other COVID-19 guidance.
>
>   "This team found some common violations among several establishments," said Dr. Lee B. Smith, MCHD executive director and county health officer. "Some citations were

issued and we had the opportunity to go over guidance with these business owners so they could run their establishments more safely. We are all in this together and having rising numbers of COVID-19 will have a negative impact on us all."

…

"These were all COVID-based violations," said Jennifer Costolo-Michael, MCHD Environmental Health registered sanitarian. "These were issued when there was just overwhelming evidence of no mask wearing and overcrowding — public health concerns that could lead to the spread of COVID-19."

**Exhibit 12** attached.

Governor Justice promptly reinstituted the prohibition against the against on-premises sale of food and/or drink in bars in Monongalia County in Executive Order No. 65-20, Complaint Ex. 37, issued September 2, 2020.  Morgantown City Council authorized imposition of local restrictions the same as those imposed in Executive Order No. 65-20, by Morgantown Emergency Ordinance 2020-5, adopted September 1, 2020, and implemented by order of the Interim City Manager September 2, 2020.  (*See* **Exhibit 13** and **Exhibit 14**, attached, respectively).  Executive Order No. 65-20 – and by extension the parallel provisions of the City Manager's order - maintained the ability of bars with food service to operate on the same terms as other restaurants. *See* Executive Order no. 65-20, Complaint Ex. 37, at ¶ 2 ("… tables and seats at bar tops within 'bar areas' of restaurants, hotels, and other similar facilities may be used for general seating for dining, subject to the same limitations as are in place for restaurants, including without limitation the requirement to maintain adequate social distancing.").

CDC guidance states that "the more people an individual interacts with at a gathering and the longer that interaction lasts, the higher the potential risk of becoming infected with COVID-19 and COVID-19."[8]  Superspreading events tend to happen in indoor spaces, with people in close

---

[8] See, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html

proximity.[9]  In a  COVID-19 risk study on 314 COVID-19 patients being treated in July, 2020, the CDC reported adults who tested positive for the coronavirus were more than twice as likely to have dined at a restaurant in the two weeks before getting sick than people who were uninfected. Those who tested positive and did not have close contact with anyone sick were also more likely to report going to a bar or coffee shop. [10]

The Washington Post recently reported that "states that have reopened bars experienced a doubling in the rate of coronavirus cases three weeks after the opening of doors, on average. The Post analysis — using data provided by SafeGraph, a company that aggregates cellphone location information — found a statistically significant national relationship between foot traffic to bars one week after they reopened and an increase in cases three weeks later …Few states make their contact-tracing data available, but in two that do — Colorado and Louisiana — bars and restaurants are responsible for about 20 percent of cases traced to a known source. San Diego traced nearly one-third of community outbreaks to restaurants and bars, more than any other setting." [11], [12]

The CDC has offered these "Considerations for Restaurants and Bars" (Updated September 6, 2020):

> The more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread. The risk of COVID-19 spread increases in a restaurant or bar setting as follows:

---

[9]  See:  https://www.newscientist.com/article/2250375-finding-coronavirus-superspreaders-may-be-...

[10] Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities United States, July 2020,  Morbidity and Mortality Weekly Report, September 11, 2020 Vol. 69, No, 39, Pgs. 1258 - 1264 ,  US De-partment of Health and Human Services/Centers for Disease Control and Prevention

[11] "More cities and states are opening bars and restaurants despite mounting evidence of potential danger, by Rachel Weiner, et al., The Washington Post, September 14, 2020.  **Exhibit 15**, attached.

[12] Slide: COVID-19 Confirmed Community Outbreaks per Setting, San Diego County, CA Emergency Operations Center Media Briefing, October 7, 2020.  **Exhibit 16**, attached.

**Lowest Risk**: Food service limited to drive-through, delivery, take-out, and curb-side pick up.

**More Risk**: Drive-through, delivery, take-out, and curb-side pick-up emphasized. On-site dining limited to outdoor seating. Seating capacity reduced to allow tables to be spaced at least 6 feet apart.

**Even More Risk:** On-site dining with both indoor and outdoor seating. Seating capacity r educed to allow tables to be spaced at least 6 feet apart.

**Highest Risk**: On-site dining with both indoor and outdoor seating. Seating capacity not reduced and tables not spaced at least 6 feet apart.[13]

Containing the spread of COVID-19 in Morgantown and Monongalia County is critical to the safe operation of the Monongalia County K-12 schools and to West Virginia University, the county's largest employer and most important economic engine.[14] In a sworn affidavit filed in the COVID-19-related litigation in the Circuit Court of Kanawha County involving public schools, Dr. Clay Marsh, a physician, Vice President and Executive for Health Sciences at West Virginia University, and an advisor to the Governor and other state officials working to contain the pandemic, has stated that  "COVID spreads person to person through droplets, aerosols, talking, yelling, screaming, coughing, sneezing, and just breathing, and it spreads more the longer persons spend in contact with each other." … "It is clear that the principle cause of COVID spread in businesses, schools, churches and in congregate settings is the spread of corona virus in the community." …. "The lower the rate of COVID-19 spread, the more likely we will be able to keep

---

[13] See, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/business-employers/bars-restaurants.html  (Last visited 10/14/20)

[14] The WVU Morgantown campus enrolled 26,839 students in the Fall of 2019. https://www.wvu.edu/about-wvu/wvu-facts  The WVU Morgantown campus employs over 7600 persons. https://www.morgantownpartnership.com/economic-development/top-employers/#:~:text=Top%20Employers%20in%20the%20Morgantown%20area%3A&text=Monongalia%20County%20Board%20of%20Education,Mylan%20Pharmaceuticals%20%20%E2%80%93%3%20600%20employees

schools open and sustain school-based activities for the future."  Affidavit of Clay Marsh, MD.

**Exhibit 17** attached.

In an open letter to the West Virginia University community, issued September 2, 2020, President Gordon Gee commented on the risks facing WVU attendant to the Monongalia County bars reopening.

> With the opening of bars, it was anticipated our students who are of age would be patrons. But the lack of following safety protocols – including not wearing masks or following physical distancing guidelines – is a flagrant disregard for our community's safety, both the campus community and the city of Morgantown. …. These actions will lead to serious consequences including additional community spread of COVID-19 and the closing of an on-campus learning environment. … This is a critical moment for West Virginia University. If we want to continue on-campus learning, we must make the right choices.[15]

President Gee's concerns about the West Virginia University's continuation of on-campus learning (a crucial under-pining of Morgantown's economic prosperity) are well-founded. The evidence of community spread of the COVID-19 virus associated with Monongalia County bar re-openings in June and August reported in the MCHD press releases quoted above is further supported by the WVU COVID-19 campus testing data which reflect a significant upswing in positive COVID-19 tests among students following the brief re-opening of Morgantown bars on August 31, 2020. [16]

Monongalia County Health Officer Dr. Lee B. Smith has coordinated the community's response to the pandemic and these outbreaks.  *See* Declaration attached as **Exhibit 19**.  Dr. Smith confirms that bars have significant potential to spread COVID-19, and the data indicates that has

---

[15] See: https://presidentgee.wvu.edu/messages/gatherings-outside-morgantown-bars-put-us-all-in-jeopardy
[16] See **Exhibit 18**, attached. "Morgantown Campus Testing Cumulative Results by Week ,  See also,  https://www.wvu.edu/return-to-campus/daily-test-results/morgantown#daily-campus-testing  (Last visited 10/15/20)

occurred in Monongalia County.  *Id*.  Outbreaks at bars have limited the MCHD's ability to perform the contact tracing necessary to contain community spread of COVID-19.  *Id*. at ¶ 24.

The pandemic has not abated. Worldwide there have been more than 37 million confirmed cases and 1,077,799 COVID-19 deaths reported as of October 13, 2020, by the World Health Organization.[17]   The Declaration of a noted California epidemiologist, Dr. Arthur Reingold, filed in California Superior Court proceeding, is attached as **Exhibit, 20.** Dr Reingold's Declaration n further documents the fact that the pandemic continues in full force and requires continued public health interventions.

The Center for Disease Control ("CDC") reports the United States has suffered 7,740,934 cases of Covid-19 and 214,108 deaths from COVID-19 as of October 12, 2020.  The CDC also reports there were 344,300 new cases of COVID-19 and 449 deaths in the United States in the seven days ending October 12, 2020 at 12:29 PM.[18]

The West Virginia Department of Health and Human Resources ("WVDHHR") reports that as of 10:00 AM, October 14, 2020, there have been a total of 18,818 COVID-19 cases and 391 COVID-19 deaths in West Virginia.  Monongalia County has suffered 2183 COVID-19 cases as of 10:00 AM, October 14, 2020.[19] The WVDHHR reported 1,668 cases of new confirmed or probable new COVID-19 cases statewide and 19 probable or confirmed deaths over the 7-day

---

[17] https://covid19.who.int/?gclid=Cj0KCQjwoJX8BRCZARIsAEWBFMKn7SBzbebW-o9FfViWvGdBNxFvANiquaFzP50QPgem109HWdaAvqYaAnQcEALw_wcB,. (Last viewed October 13, 2020 at 10:45 AM.)

[18] .   https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (Last viewed October 13, 2020 at 10:45 AM.)

[19] https://dhhr.wv.gov/News/2020/Pages/COVID-19-Daily-Update-10-13-2020.aspx .

period be-tween October 7 and October 14, 2020.  Monongalia County accounted for 59 of the new or probable cases in that 7-day period.[20]

In an October 12, 2020 appearance on CNN, Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, commented to show host Jake Tapper on the latest data showing an upward trend in COVID-19 cases in 31 states and an estimate from the Institute for Health Metrics and Evaluation (IHME) at the University of Washington projecting another 181,000 deaths from COVID-19 in the United States by February, 2021.

> "I hope these numbers that you're quoting, which are absolutely correct numbers, jolt the American public into the realization that we really cannot let this happen — because it's on a trajectory of getting worse and worse. And that's the worst possible thing that can happen as we get into the cooler months,"

<u>Discussion</u>

**1. Plaintiffs cannot succeed on the merits because the public health orders promote a legitimate state interest in preventing the spread of a deadly pandemic.**

A law involving public health emergencies will only be struck down if it has "no real or substantial relation to those objects, or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31, 25 S. Ct. 358, 263 (1905); *see also TJM 64, Inc. v. Harris*, __ F. Supp. 3d __ (W. D. Tenn. July 29, 2020), *available at* 2020 WL 4352756 at *3.  "All agree that the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts."  *League of Independent Fitness Facilities and Trainers, Inc. v. Whitmer*, 814 Fed. Appx. 125 (6th Cir. June 24, 2020) (order granting stay) (*citing Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S.Ct. 358, 49 L.Ed. 643 (1905)); *see also Luke's Catering*

---

[20] https://dhhr.wv.gov/COVID-19/Pages/default.aspx (Last visited 10/14/2020 at 12:11 PM.

*Service, LLC v. Cuomo*, ___ F. Supp. 3d ___ (W.D.N.Y. September 10, 2020), *available at* 2020 WL 5415008 ("In Jacobson v. Massachusetts, decided more than 100 years ago, the United States Supreme Court developed the framework governing emergency public health and public safety measures. Considering a Massachusetts mandatory-vaccination statute enacted to combat a smallpox epidemic, the Court rejected Jacobson's Fourteenth Amendment claim that the law violated his right to personal autonomy. *Jacobson*, 197 U.S. at 29. It instead found that "the liberty secured by the Constitution...does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Jacobson*, 197 U.S. at 26.").  Supreme Court precedent dictates that "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29.  "Under the highly deferential *Jacobson* standard, courts are authorized to review only whether 'a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' *Jacobson*, 197 U.S. at 28, 31."  *Luke's Catering, LLC*, at *6.  This *Jacobson* review encompasses "asking whether power has been exercised in an 'arbitrary, unreasonable manner,' or through 'arbitrary and oppressive' regulations." *In re Abbott*, 954 F.3d at 784 (*citing Jacobson*, 197 U.S. at 28, 38); *see also Lawton v. Steele*, 152 U.S. 133, 136, 14 S. Ct. 499, 38 L. Ed. 385 (1894) ("To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.").

West Virginia law, like federal law, is clear that the police power includes broad authority to establish public health protections.  *Foundation for Independent Living, Inc. v. The Cabell-Huntington Bd. of Health*, 214 W. Va. 818, 591 S.E.2d 744 (2003).  Local exercise of these public health authorities is not unconstitutional as a usurpation of the legislative power.  *Id*. at 214 W. Va. 829-30, 591 S.E.2d 755-6.  Nor do reasonable classification among businesses by public health authorities violate plaintiffs' entitlement to equal protection of the laws.  *Id*. at 214 W. Va. 759, 591 S.E.2d 833.

The public health measures at issue – limitations on indoor gatherings, particularly those in bars – relate to the public health emergency because of the unique danger these locations pose of spreading COVID-19.  *See* **Exhibit 19**.  The restrictions imposed are based on medical guidance, and Plaintiffs can point to no basis for declaring them a plain, palpable invasion of their rights.  Accordingly, longstanding precedent applicable to public health emergencies dictates that the restrictions be upheld and that Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims.

Even under rational basis review, which has also been applied to challenges to business restrictions in the COVID-19 pandemic, Plaintiffs cannot invalidate the public health orders because they use medical guidance to protect the public.  *See Talleywhacker, Inc. v. Cooper*, __ F. Supp. 3d ___ (E.D.N.C. June 8, 2020), *available at* 2020 WL 3051207.  Plaintiffs allege the Governor's Executive Orders, and the City of Morgantown emergency ordinances and city manager orders, violate their rights to equal protection of the law and to due process of law. (Complaint, §§ V., VIII., X.).

The Fourteenth Amendment prevents any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws.*" U.S. Const. amend XIV*. "In evaluating an equal

protection challenge to a rule, courts must first determine the standard of review to apply. If the rule neither infringes a fundamental right nor disadvantages a suspect class, courts apply rational basis review." *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Lynch*, 826 F.3d 191, 196 (4th Cir. 2016) (*citing FCC v. Beach Commc'ns, Inc*., 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L.Ed.2d 211 (1993)); *see also Talleywhacker, Inc. v. Cooper*, ___ F. Supp. 3d. ___ 2020 WL 3051207.

Plaintiffs are business operators – they do not belong to a suspect class. *Talleywhacker* at *9 (*citing Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race is a suspect class); *Oyama v. California*, 332 U.S. 633, 646, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (national origin is a suspect class); *Graham v. Richardson*, 403 U.S. 365, 376, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage is a suspect class); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender is a quasi-suspect class); *Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988)* (illegitimacy is a quasi-suspect class)).

The regulation of business does not impinge a fundamental right. *Id*. ("Moreover, the regulation of business operations does not "impinge on fundamental rights." (*citing Levin v. Commerce Energy, Inc*., 560 U.S. 413, 426 & n.5, 130 S.Ct. 2323, 176 L.Ed.2d 1131 (2010); *see, e.g*., *N. Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc*., 414 U.S. 156, 167, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973) ("[W]e emphatically refuse to go back to the time when courts used the Due Process Clause 'to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' "); *Nat'l Ass'n for the Advancement of Multijurisdiction Practice*, 826 F.3d at 196; *cf. Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)(recognizing a "fundamental right of parents to make decisions concerning the care, custody, and control of

their children"); *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 n.3, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (fundamental rights include those of a "uniquely private nature," the "right to vote," the "right of interstate travel," rights "guaranteed by the First Amendment," and the "right to procreate")).  Plaintiffs do not contend the State's or the City's interests in protecting the public health are illegitimate; thus, the only question for the Court is whether there exists some rational basis for the regulations.  *Talleywhacker* at 10.  ("… i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Id.* (*quoting Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970))").  National, state, and local health officials have identified prolonged indoor gatherings – particularly those where masks are not worn – as uniquely dangerous because of their likelihood to spread COVID-19.  *See* **Exhibit 19**.  Monongalia County, along with other areas throughout the world, has experienced COVID-19 outbreaks occurring at bars.  *Id.*  Under these circumstances, regulations limiting the size of indoor gatherings so that adequate distance can be maintained, and applying those restrictions to both restaurants and bars[21], has a rational purpose to limit prolonged indoor interaction and protect against COVID-19 infections.   Similar restrictions are upheld in other communities.  *See Talleywhacker, Inc. v. Cooper*, ___ F. Supp. 3d. ___ 2020 WL 3051207;  *4 Aces Enterprises, LLC et al. v. Edwards*, ____ F. Supp. 3d ____, 2020 WL 4747660; *Luke's Catering Service, LLC v. Cuomo*, ___ F. Supp. 3d ___ 2020 WL 5415008; *Benner v. Wolf*, ___ F. Supp. 3d. __ (M.D. Pa. May 21, 2020), *available at* 2020 WL 2564920.  Accordingly, Plaintiffs cannot meet their burden to establish a likelihood of success on the merits and their Motion for Preliminary Injunction should be denied.

---

[21] Pursuant to Executive Order No. 75-20, the 50% occupancy limits applicable to restaurants are the same occupancy limits applicable to bar areas, regardless of food service.

In their "Motion for Preliminary Injunction," Plaintiffs assert they are likely to prevail on the merits of their claims on two grounds:  (A) separation of powers, and (B) due process and takings.  (Mot. for Injunction at 6, 8).  These claims fail because the governmental action at issue is a lawful public health order, properly reviewed under the standards set forth above, rather than a taking of private property without just compensation.  Plaintiffs do not address their Equal Protection Claim (Complaint, § V.) or their claim that the City of Morgantown ordinances are "void for vagueness" for failing to give adequate notice of the conduct violating a criminal statute (Complaint, ¶ 113) and thus have not met their burden to establish any likelihood of success on the merits of those claims.

### a.   Separation of Powers

The separation of powers claim asserts that the longstanding legislative powers granted to the Governor to deal with public emergencies amount to an unconstitutional delegation of legislative authority to the executive branch.  *See W. Va. Code* §§ 15-5-1 *et seq*.  The District Court in *County of Butler v. Wolf*, the decision cited by Plaintiffs as support for their position, made no finding specifically as to Pennsylvania's emergency powers legislation; rather, it held that the emergency actions taken pursuant to that legislation violated the plaintiffs First Amendment, Equal Protection, and Due Process rights.  *County of Butler, et al. v. Wolf*, ___ F. Supp. 3d. ____ (W.D. Pa. Sept. 14, 2020), *available at* 2020 WL 5510690.  The enforcement of that opinion was stayed by the Third Circuit Court of Appeals.  *County of Butler v. Governor of Pennsylvania*, Not Reported in Fed. Rptr. (3d Cir. Oct. 1, 2020), *available at* 2020 WL 5868393.  Another Pennsylvania District Court reached a different conclusion – applying the *Jacobson* standard of review applicable to emergency public health orders and finding Governor Wolf's orders could not be enjoined because the interests of the public require government action, and that action

(limiting gatherings and business operations) was reasonably necessary to address the emergency. *Benner v. Wolf*, ___ F. Supp. 3d. __ (M.D. Pa. May 21, 2020), *available at* 2020 WL 2564920. The Michigan Supreme Court did recently hold that its state emergency powers act constituted an unconstitutional delegation of legislative authority. *In re Certified Questions From United States Dist. Court , W. Dist. of Michigan, S. Div., No. 161492*, 2020 WL 5877599 (Mich. Oct. 2, 2020) (delegation under EPGA was in violation of provision prohibiting exercise of legislative power by executive branch). That decision was based on state law and its theory has not been applied in the numerous other legal opinions considering emergency public health measures addressing COVID-19, particularly those that apply specifically to bars, as presented in this case.

Multiple federal courts throughout the nation and the Fourth Circuit have reviewed public health orders issued under similar emergency powers acts and upheld them. *See, e.g., Talleywhacker v. Cooper*, ___ F. Supp. 3d. ___, 2020 WL 3051207 (restrictions on operation of dance clubs, adult-oriented dance clubs, and live and recorded music venues permissible under intermediate scrutiny); *4 Aces Enterprises, LLC et al. v. Edwards*, ____ F. Supp. 3d ____, 2020 WL 4747660 (request to enjoin Governor's ban on consumption of food and drink in bar areas denied). The nondelegation doctrine simply requires that a legislative delegation of authority provide an intelligible principle directing the executive how to act. *See Gundy v. U.S.*, 588 U.S. ___, ___, 139 S. Ct. 2116, 213 (2019) ("So we have held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.' *Ibid.* (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S. Ct. 348, 72 L. Ed. 624 (1928); brackets in original)."); *Mistretta v. U.S.*, 488 U.S. 331 (1991) (Separation-of-powers principle, and non-delegation doctrine in particular, do not prevent

Congress from obtaining assistance of its coordinate branches).  West Virginia Code delegates emergency powers to the governor only in specific areas identified in *W. Va. Code* § 15-5-6, and only during a state of emergency.  *Id*.  The legislature defined an intelligible principle for determining when a state of emergency exists in *W. Va. Code* § 15-5-6(a), which allows the governor or legislature to declare a state of emergency only when "an attack upon the United States has occurred or is anticipated in the immediate future, or that a natural or man-made disaster of major proportions has actually occurred or is imminent within the state, or that an emergency exists or may be imminent due to a large-scale threat beyond local control, and that the safety and welfare of the inhabitants of this state require an invocation of the provisions of this section."  *Id*.  The legislature retains authority to terminate a state of emergency declared by the governor.  *W. Va. Code* § 15-5-6(b).  During a state of emergency, the Governor may take extraordinary action in 11 defined areas.  *W. Va. Code* § 15-5-6(c).  The delegation of authority to contain the spread of infectious disease by measures restricting ordinary movement of the population through particular areas has been established as a constitutionally permissible legislative action since *Jacobson v. Commonwealth of Massachusetts* was decided in 1905.  197 U.S. 11 (1905).  In the limited, and novel, decisions suggesting that legislative delegations of emergency authority may violate the separation of powers required by the United States constitution or similar state constitutional provisions, the orders rely on the extended nature of restrictions and their broad, rather than targeted, application to activity of the public.  *See County of Butler*, at *8.  By contrast, the Governor's Executive Orders at issue in this case – and the City of Morgantown actions imposing the same restrictions – are recent, and they target specific, local activity that has created outbreaks of COVID-19 infections.  Morgantown and Monongalia County suffered COVID-19 outbreaks occurring at bars in early July, including infections at Plaintiffs Big Times and Baby Squirrels

Saloon.  **Exhibit 19**.  When restrictions were eased, large crowds without masks immediately gathered to enter the bars.  To the extent that the Court finds the theory in *County of Butler*, and Justice Alito's dissent to the Supreme Court's denial of review in *Calvary Chapel Dayton Valley v. Sisolak*, persuasive, the measures at issue here are exactly the type of evolving, targeted public health orders that would seem to meet this more exacting review.  *Cf. Calvary Chapel Dayton Valley v. Sisolak*, ⸺ U.S. ⸺, 140  S.Ct. 2603   2020 WL 4251360 (Jul. 24, 2020) (Alito, J., dissenting) ("As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights.")

As applied to the actions of Defendants The City of Morgantown ("Morgantown") and Emily Muzzarelli, Interim City Manager ("City Manager"), the Plaintiffs' argument similarly will not succeed on the merits.  West Virginia law is clear that the state has broad authority to delegate police powers to municipal authorities and local boards of health. That police power includes broad authority to regulate businesses to establish public health protections to prevent the transmission of disease through the air and water. *Foundation for Independent Living, Inc. v. The Cabell-Huntington Bd. Of Health*, 214 W. Va. 818, 591 S.E.2d 744 (2003).  Local exercise of these public health authorities is not unconstitutional as a usurpation of the legislative power.  *Id*. at 214 W. Va. 829-30, 591 S.E.2d 755-6.  Nor do reasonable classifications among businesses by public health authorities violate plaintiffs entitlement to equal protection of the laws.  *Id*. at 214 W. Va. 759, 591 S.E.2d 833.  The emergency ordinances adopted by the City legislated in accordance with the City Council's plenary power and authority to protect public health under *W. Va. Code* § 8-12-5(23), (40), (44), and (58).  Each of the emergency ordinances authorized the City Manager to implement the legislation within the strict specifications of the ordinance language, upon

consultation with public health authorities, and during a time period with an expiration date set by the legislative body.  The only ordinance that Plaintiffs claim impacts them, Emergency Ordinance 2020-5, authorized the City Manager to impose the same restrictions on Plaintiffs as provided in the Governor's Emergency Orders.  Thus, Plaintiffs have no separate claim against Morgantown or the City Manager on the basis of the non-delegation doctrine.

For the same reason, Plaintiffs' claim that the City of Morgantown ordinances are "void for vagueness" for failing to give adequate notice of the conduct violating a criminal statute cannot succeed (Complaint, ¶ 113).  Rather than granting unlimited enforcement discretion to charge crimes such as "loitering," Emergency Ordinance 2020-5, and the City Manager order implementing it, applied only to very detailed conduct: gathering in groups exceeding 25 persons and serving alcohol at bar areas without consumption of food, both as more particularly specified in the Governor's Executive Order 65-20.  *See Foundation for Independent Living, Inc.,* 214 W. Va. 818, 591 S.E.2d 744; c*f. City of Chicago v. Morales*, 527 U.S. 41 (1999).  Law enforcement officers were granted no discretion to determine when these violations occurred, the authority granted was consistent with preexisting authority to enforce the Governor's orders under *W. Va. Code* § 15-5-18, and Plaintiffs do not allege that they have been subject to any criminal enforcement of the law.

### b.  Due Process and Takings

Plaintiffs separately argue their likelihood of success under a "due process and takings" category. (Mot. for Injunction at 8).  The due process analysis set forth above controls this claim, and the rational basis supporting the public health measures requires that Plaintiffs be denied injunctive relief.  Plaintiffs have set forth no separate allegations supporting their claim that the public health measures constitute a taking of their property without just compensation.  While

takings claims are analyzed here in response to Plaintiffs' motion, this case should be fully disposed of by rational basis review of the public health measures restricting certain gatherings and business uses that – based upon medical guidance and known incidents – create a dangerous risk of spreading COVID-19.

To proceed on a takings claim, Plaintiffs would need to establish that the public health measures deny them all economically beneficial use of their property or that the regulation frustrates their investment-backed economic expectations without corresponding public benefit. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) (regulatory taking occurs only when regulation denies all economically beneficial or productive use of land); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) (test evaluates three factors: (1) the economic effect of the regulation applicable to the property, (2) the property owner's reasonable investment-backed expectations for development, and (3) the character of the regulation).  The public health measures complained of, which allowed consumption of alcohol with food but limit dense gatherings at bar areas as well as consumption of alcohol without food – and which now simply provide occupancy restrictions at bars and restaurants to limit dense gatherings –  not only allow beneficial use of Plaintiffs' property but allow Plaintiffs to continue substantially the same use as they have already made of their properties, albeit at lower capacity to allow patrons to gather at a reasonably safe distance.   The public health measures are also limited to the duration of the public health emergency caused by COVID-19 and do not permanently affect Plaintiffs' property uses.  Assuming arguendo, the emergency public health orders may have impacted the revenues of Plaintiffs' businesses, that impact is insufficient to establish a taking when considering the important public health protections provided by the regulation.  *See TJM 64, Inc. v. Harris*, ___ F. Supp. 3d ___ (W. D. Tenn. July 29, 2020), *available at* 2020 WL 4352756 (denying injunction

against order closing bars and allowing businesses with 50% of revenue from food service to remain open).  As the *TJM 64, Inc.* opinion notes, the public health orders are exercises of the police power and do not constitute a taking for a public use.  *Id*. at 7. ("The Takings Clause does not render every government action a taking just because it has a detrimental effect on the owner's property; the text of the Takings Clause dictates that a regulatory action will only constitute a taking, and thus require just compensation, when the property is being taken for the 'public use.' *See United States v. Droganes*, 728 F.3d 580, 591 (6th Cir. 2013) (noting that the state's seizure of property was an exercise of its "police power" and did "not constitute a 'public use' " (*quoting Innovair Aviation, Ltd. v. United States*, 632 F.3d 1336, 1341 (Fed. Cir. 2011))); *see also AmeriSource Corp. v. United States*, 525 F.3d 1149, 1152 (Fed. Cir. 2008) ("The [Takings] [C]lause does not entitle all aggrieved owners to recompense, only those whose property has been taken for a public use."); *Lech v. Jackson*, 791 F. App'x 711, 719 (10th Cir. 2019) (agreeing with the Federal Circuit that if a government's exercise of power to rid an individual of property is not pursuant to its power of eminent domain but some other police power, the Takings Clause is not implicated)").  Plaintiffs cannot establish a likelihood of success on the merits of a takings claim and accordingly must be denied injunctive relief.

### 2.  Plaintiffs will not suffer irreparable harm

Executive Order of the Governor Order No. 2 –20, Complaint Ex. 4, issued on March 18, 2020 barred on-premises sale of food or drink by restaurants and bars. Sale of food and beverages in closed containers for off-premises consumption was permitted.  Gradual re-opening followed with outside, on-premises sales permitted in Executive Order No. 32-20, Complaint Ex. 17, issued April 30, 2020. Emergency Ordinance No. 2020- 02, adopted May 19, 2020, **Exhibit 5**, facilitated the outdoor sale of food and drink by suspending minimum parking and signage requirements to

create space for outdoor sales. Executive Order 40-20, Complaint Ex. 24, issued May 22, 2020, permitted 50% indoor occupancy of restaurants and bars. Executive Order No. 52-20, Complaint Ex. 32, issued July 13, 2020, reinstituted the prohibition of on-premises sale of food or drink in bars in Monongalia County and limited occupancy of bars for purposes other than picking up food and/or drink for a period 10 days. That prohibition was extended by a series of Executive Orders until August 30, 2020 when on-premises sales were again allowed for a brief period until September 2, 2020 when Executive Order No. 62-20, Complaint Ex. 37, again prohibited the on–premises consumption of food and drink in Monongalia County.  At no time have the plaintiffs been entirely banned from selling food and drink.

Plaintiffs' damages, if any, are money damages which do not qualify them for injunctive relief.  Economic loss is not generally sufficient to show irreparable harm.  *DiBiase v. SPX Corporation*, 873 F.3d 224, 230 (2017) ("A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." (*citing Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp*., 17 F.3d 691, 693 (4th Cir. 1994)).  Plaintiffs have failed to meet their burden to establish any irreparable harm because they allege only recoverable economic loss.  This factor weighs against granting the injunction.

3. **Equity favors the State and the City because West Virginia citizens will be harmed by COVID-19 if public health orders are voided.**

In arguing the balance of equities, the Plaintiffs offer the proposition that the "Governmental Defendants interest is limited to enforcing the law."  The oath of office taken by all but a few public officers in West Virginia, from a city council member to the Governor of the State, requires that the public officer "faithfully discharge the duties of his said office to the best of his skill and judgment."  Responding to natural disasters is a duty of public office.

West Virginia Code §15-5-6 speaks to the emergency powers of the Governor in event of a natural disaster such as a pandemic and contemplates that the Governor will invoke his emergency powers when the safety and welfare of the inhabitants of the state require him do so.[22] Similarly, the Legislature has delegated to municipal authorities the authority to act to protect the public health, including when a state of emergency arises. *West Virginia Code* § 8-12-5, ¶¶ 23, 40, 44 and 58; *W. Va. Code* § 8-11-4(d) (authorizing emergency ordinances).

Balancing the equities in the context of a worldwide pandemic requires the Court to take a broader view than the narrow inquiry suggested by Plaintiffs.   The immediate harm suffered by the public if injunctive relief is granted will be measured in an increased number of persons

---

[22] §15-5-6. Emergency powers of Governor.

    **(a) The provisions of this section are operative only during the existence of a state of emergency** or state of preparedness. The existence of a state of emergency or state of preparedness may be proclaimed by the Governor or by concurrent resolution of the Legislature **if the Governor in the proclamation**, or the Legislature in the resolution, **finds** that an attack upon the United States has occurred or is anticipated in the immediate future, **or that a natural** or man-made **disaster of major proportions has actually occurred or is imminent within the state, or that an emergency exists or may be imminent due to a large-scale threat beyond local control, and that the safety and welfare of the inhabitants of this state require an invocation of the provisions of this section.**

    ...

(b) So long as a state of emergency or state of preparedness exists, the Governor has and may exercise the following additional emergency powers:

…

(6) **To control ingress and egress to and from** a disaster area or **an area where large-scale threat exists**, the movement of persons within the area **and the occupancy of premises therein**;

…

(9) **To suspend or limit the sale, dispensing or transportation of alcoholic beverages**, explosives and combustibles;

…

(11) To perform and exercise other functions, powers and duties that are necessary to promote and secure the safety and protection of the civilian population.

(Bolded emphasis supplied)

infected with a deadly disease.  The potential harm to the public extends far beyond the immediate effect. To keep ourselves safe, we have suspended many of the things we hold dear, such as graduations, summer fairs and family get-togethers.  Elderly West Virginians are unable to visit their grandchildren and many are quarantined in settings where they cannot be visited by any family member.   Healthcare workers daily risk their lives to treat those afflicted with the virus. School children are forced to grapple with remote, online learning in a state with a severely limited fiber-optic network.   Public services are limited or altered.[23] West Virginia University, the community's cultural center and economic engine, placed nearly 900 employees on furlough due to reduced revenues and uncertainty directly related to the ongoing pandemic.[24]  The Center for Medicaid Studies has reported that Medicare payments for Fee-for-Service COVID-19 hospitalizations were $4.4 Billion through August 15, 2020. It cost Medicare an average of $24,582 for each COVID-19 hospitalization.  It is reasonable to conclude that both Medicare and non-Medicare patients are incurring billions of dollars more in medical costs stemming from the pandemic.  West Virginia University Health System, headquartered in Morgantown, and its employees throughout the state, felt the economic impact of these losses – reducing employee pay

---

[23] This Court recognized, early in the pandemic, the need to protect the public by limiting access to its courthouses, which are traditionally open to the public for observation of the essential public business.  UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA, Public Advisory Regarding Operating Procedures in Response to COVID-19, dated March 20, 2020, *available at* https://www.wvnd.uscourts.gov/sites/wvnd/files/Public%20Advisory%20March%202020.pdf (last accessed October 16, 2020).

[24] *See* WV Metronews, "WVU Responds to Pandemic, Furloughs 875 workers," published May 8, 2020, *available at* https://wvmetronews.com/2020/05/08/wvu-responds-to-pandemic-furloughs-875-workers/ (last accessed October 16, 2020).

by 25% in some instances and suspending the employers matching retirement contributions through the end of 2020. [25]

In comparison to any limited economic loss Plaintiffs might suffer as a result of public health restrictions impacting their businesses, equity favors the public health.  The *Talleywhacker* opinion demonstrates the application of this principle to public health orders that impose careful distinctions among gatherings, as do the public health orders here:

> [W]here defendant has taken intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic, while recognizing the continued severe risks associated with reopening, and where neither the court nor plaintiffs are better positioned to second-guess those determinations, the public interest does not weigh in favor of injunctive relief.

Id. at 14.  For the same reason, equity favors denying injunctive relief as public health authorities craft appropriately-calibrated rules to protect the public against infection.

### 4. Public health orders serve the public interest by preventing citizens' exposure to COVID-19.

Plaintiffs offer, with no analysis, that they believe issuance of an injunction is consistent with the public interest. Plaintiff's Motion for Preliminary Injunction ¶ D. Plaintiffs completely ignore the continuing COVID-19 casualties, the economic dislocations and the disrupted lives of millions of their fellow citizens caused by the pandemic. In the words of Justice Robert Jackson, if a '[c]ourt does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.'" *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949)  (Jackson, J., dissenting) (*quoted in  South Bay United Pentecostal Church. V Newsom*, 959 F.3rd 938, 939, Ninth Cir. (May 22, 2020)).

---

[25] WCHS-TV, "Some WVU Health workers to see temporary pay cut during pandemic," published April 17, 2020, *available at* https://wchstv.com/news/local/some-wvu-health-employees-to-see-temporary-pay-cut-during-pandemic (last accessed October 16, 2020).

Contrary to Plaintiffs' assertion of the public interest, the community's experience shows that the public needs protection against dangerous activities occurring in Plaintiffs' bars  and similar venues.  As demonstrated in the Declaration of Dr. Lee B. Smith, Monongalia County Health Officer, activities increasing the spread of COVID-19 and therefore dangerous to public health have been identified at many bars in the community, and several COVID-19 outbreaks have occurred at these locations. (*See* **Exhibit 19**).

Plaintiffs' interests in this case are only financial – they seek to operate their private bars without limitations designed to protect against COVID-19 infections.  The public health orders recognize that these businesses create a unique threat of superspreader events because of their likelihood to bring patrons in close proximity to each other without masks and with reduced inhibitions.  The balance of the equities and the public interest are factors that merge when the government is the opposing party.  *Antietam Battlefield KOA v. Hogan*, ___ F. Supp. 3d ___ (D. Md., May 20, 2020) *available at* 2020 WL 2556496 ("the balance of the equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)), also do not weigh in favor of granting a TRO or a preliminary injunction. Here the harm to the public in granting a TRO or preliminary injunction, which may result in more transmissions of COVID-19 and more cases of serious illness and death, could be great. This harm to the public is not outweighed by the irreparable harm the plaintiffs might suffer, especially when the plaintiffs have not demonstrated a likelihood of success in showing that the harm is a result of any constitutional violation.").  Accordingly, the public interest factor weighs against injunctive relief.

<u>Conclusion</u>

The public health orders at issue in this matter protect the public against infection by COVID–19, a novel severe acute respiratory illness that has killed more than 210,000 people nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others.  Chief Justice Roberts, considering these circumstances, directed courts to entrust the health and safety of the people to politically accountable elected officials who have access to public health experts to guide their decisions.  *South Bay United Pentecostal Church v. Newman*, ___ U.S. ____, 140 S. Ct. 1613 (Roberts, C.J., concurring in denial of injunction).  The Chief Justice's direction is grounded in longstanding constitutional precedent, as he noted:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38, 25 S.Ct. 358, 49 L.Ed. 643 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

*Id*. at 1614.  Defendants' public health regulations are based on competent expert assessments of the grave public health threat, and the manner in which it spreads among the public.  The regulations have dynamically adapted to the nature of the threat, and they will continue to do so until the public health emergency ends.  Until that point, the politically accountable representatives of the people should continue to make the rational decisions necessary to protect the public health.

For the foregoing reasons, the Defendants The City of Morgantown and Emily Muzzarelli, Interim City Manager, respectfully request that the Court deny the Plaintiffs' Motion for Preliminary Injunction and grant these Defendants additional relief as appropriate.

Respectfully submitted

The City of Morgantown and
Emily Muzzarelli, Interim City Manager
Defendants
By Counsel

/s/ Ryan P. Simonton
_____
John R. Hoblitzell (WVSB# 1746)
Ryan P. Simonton (WVSB#11152)
Matthew D. Elshiaty (WVSB# 12535))

**Certificate of Service**

I, Ryan P. Simonton, hereby certify that on this 19th day of October, 2020, I have served

the foregoing *Defendants City of Morgantown and Emily Muzzarelli's Response in Opposition to*

*Plaintiffs' Motion for Injunction* on the following persons counsel through the Court's ECF

system, which will notify the following of said filing:


Martin P. Sheehan, Esquire
MARTIN P. SHEEHAN, ESQ.
Sheehan & Associates
1 Community Street, Suite 200
Wheeling, WV  26003
Telephone: (304) 232-1064
Telefax: (304) 232-1066
sheehanbankruptcy@wvdsl.net

Benjamin L. Bailey, Esquire
Benjamin Hogan, Esquire
Bailey & Glasser, LP
209 Capitol Street
Charleston, WV  25301
Telephone: (304) 345-6555
Telefax: (304) 342-1110
bbailey@baileyglasser.com


/s/ Ryan P. Simonton (WVSB#11152)