**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AJE ENTERPRISE LLC d/b/a
WHISPER NIGHT CLUB AND LOUNGE;
ADAM EREDITARIO;**

**BITS LLC d/b/a FAT DADDY'S;
BRIANA WEISEN;**

**DRD2 LLC d/b/a ALMOST HEAVEN
BAR & GRILL;
DANIELLE DUFALLA;**

**BABY SQUIRRELS, LLC;
BABY SQUIRRELS SALOON;
TRAVIS TRACY;**

**B.F. UGLY'S d/b/a BIG TIMES;
ALIAS ENTERPRISES, LLC d/b/a CODE;
ZACH TRAUGH;**

**CARIBBA FOODS, LLC d/b/a CRAB SHACK
CARIBBA AND DOCKSIDE GRILLE;
BRON KAYAL;**

**CECELIA'S d/b/a JOE MAMA'S;
JOE BLODGETT;**

**EXTENSIVE ENTERPRISES;
KENNETH DUFALLA;**

**MOUNTAIN MAMAS HOT SPOT LLC;
MOUNTAIN MAMAS TAVERN LLC;
MEGAN AND JACOB SAMPLES;**

**SAR TECH LLC AND SHC LLC;
STEVE REESE;**

**JL3 LLC;
THE ANNEX;
CHRIS HARE;**

**RAY G 4TH AND GOAL d/b/a 4TH & GOAL;
RAY G SCORERS d/b/a SCORERS;
RAY GLYMPH;**

**NUT CLUB LLC d/b/a BLAZE; and**
**MAXWELL CUMMONS,**

        **Plaintiffs,**

**v.**                                **CIVIL ACTION NO. 1:20-CV-229**
                                            **Judge John Preston Bailey**

**JAMES JUSTICE, in his capacity as**
**Governor of West Virginia; FREDRIC**
**L. WOOTON, in his capacity as the West**
**Virginia Alcohol Beverage Control Administration**
**Commissioner; THE CITY OF MORGANTOWN;**
**EMILY MUZZARELLI, in her capacity as the**
**Interim City Manager of Morgantown,**

        **Defendants.**

**RESPONSE OF DEFENDANTS GOVERNOR JUSTICE AND THE WEST VIRGINIA**
**ALCOHOL BEVERAGE CONTROL ADMINISTRATION IN**
<u>**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

**Introduction**

COVID-19, unknown in West Virginia at the beginning of this year, has swept across the globe with a ferocity never experienced in our lifetimes, infecting more than 34 million people and causing more than 1 million deaths.  Governments around the world, including West Virginia's, have had to make swift and difficult decisions to control the spread of the virus, reduce infections, prevent deaths, and—since summer—try to safely and gradually reopen their societies and economies.  Some are now seeing a second wave of infections.

Plaintiffs are private clubs, a real estate business, or other bars (which are or were licensed to sell and serve alcohol) and their respective owners,[1] that seek to erase the State's response to

---

[1] According to the West Virginia Alcohol Beverage Control Administration, the following plaintiffs have not renewed their alcohol licenses as of the filing of this case per Executive Orders 7-20 and 23-20, Exs. A and B, and may not have standing for that reason alone: AJE Enterprise LLC; Baby Squirrels; Caribba foods, LLC; Extensive Enterprises; Ex. C, The Annex (not renewed by order of WVABCA due to unsuitable ownership and management); and Nut Club LLC.

the pandemic and enjoin James Justice, the Governor of West Virginia, and the West Virginia Alcohol Beverage Control Administration from enforcing and implementing Executive Orders that limit the operation of bars and restaurants in Monongalia County. Plaintiffs also seek declaratory relief, compensatory damages, attorneys' fees, and costs.  Am. Compl. ¶ 25, p. 25.  However, Plaintiffs' claims fail because the Governor is vested with broad authority under the Emergency Powers Act and the West Virginia Constitution to issue the executive orders at issue, and plain statutory language enables him to "suspend or limit the sale, dispensing or transportation of alcoholic beverages" in an emergency.  *See* W. Va. Code § 15-5-6; *id.* § (c)(9).

Plaintiffs are neither the first, nor will they be the last, who want an exception from the inconveniences they have experienced from the State's necessary responses to a once-in-a-century global public health emergency.  Notwithstanding the deleterious nature of the relief the Plaintiffs appear to request—that nearly all measures taken by the Governor in response to the pandemic be erased—many of the Plaintiffs' claims are now moot because several of the Executive Orders that Plaintiffs seek to enjoin the Governor from enforcing have been terminated or no longer remain in effect.  Even if the Court determines that Plaintiffs' claims are not moot, it should deny Plaintiffs' motion for a preliminary injunction because it does not meet the high bar required for such extraordinary relief.  That is, Plaintiffs' claims are almost certain to fail on the merits, Plaintiffs' alleged harm is not irreparable, the balance of equities does not tip in Plaintiffs' favor, and the public interest is not served by permitting individuals to attend bars where social distancing precautions and mitigation measures are not followed or enforced in the face of dangerously high rates of community transmission of the COVID-19 virus.

This is hard on all of us.  The only way our Nation, our State, and our communities will get through this with less sickness and death is if each of us carries our fair share of the load, makes

some sacrifices, and exercises patience in an effort to reduce community spread of the virus.  This all comes before the Court as West Virginia hits its peak 7-day average of new cases since the pandemic began.  *See* Ex. D, Madeline Holcombe & Dakin Andone, *21 states have hit their peak 7-day average of new Covid-19 cases this week*, CNN (Oct. 15, 2020), https://www.cnn.com/2020/10/15/health/us-coronavirus-thursday/index.html.  Despite Plaintiffs' creative efforts to dismantle the State Executive's cohesive and tailored response to keep people safe during a once-in-a-century pandemic so people can drink and dance in bars, reality and the law mandate that their motion for preliminary injunction be denied and the accompanying complaint dismissed.

## Facts

The relevant facts are known to most West Virginians, and the Governor has provided a detailed timeline of the State's robust response on his website.[2]  Other relevant facts are set out in the attached affidavits of Secretary Bill Crouch of the WVDHHR and Dr. Clay Marsh, Vice President and Executive Dean for Health Sciences at West Virginia University, appointed by the Governor as the State's COVID-19 Czar.

Well into March of this year, West Virginians had no reported cases of COVID-19.  As of the date of this filing, that previously unknown disease has infected over 20,000 West Virginians and killed at least 399.[3]  W. Va. Dept. Health and Human Res., *West Virginia COVID-19*, https://dhhr.wv.gov/COVID-19/Pages/default.aspx. Nationwide, over 8 million cases have been

---

[2]  Office of the Governor, Jim Justice, *West Virginia's Response to COVID-19*, https://governor.wv.gov/Pages/WV-COVID-19-actions-and-executive-orders.aspx (last visited Oct. 19, 2020)

[3] West Virginia Department of Health and Human Resources, *COVID-19 Daily Update 10-18-2020* (Oct. 19, 2020), https://dhhr.wv.gov/News/2020/Pages/COVID-19-Daily-Update-10-18-2020.aspx.

reported, currently at a rate of almost 50,000 new cases per day, and more than 220,000 Americans

have died of the disease.  Now we know that the disease is highly contagious and spreads through

"droplets, aerosols, talking, yelling, screaming, coughing, sneezing and just breathing, and it

spreads more the longer persons spend in contact with each other."  Ex. E, Marsh Aff. ¶ 6.[4]

Those developments and others honed the State's public health response.  Ex. F, Crouch

Aff., ¶¶ 7, 8; Ex. E, Marsh, ¶ 4.  As the COVID-19 case numbers stabilized, the Governor—advised

by a cadre of public health experts—put together a plan to reopen the State.  By Executive Order,

the Governor gradually began reopening sectors of the State and its economy, all with

restrictions—on crowd size, social distancing, and mask wearing, among others—specifically

tailored to those sectors.[5]  The phased approach is reactive to ebbs and flows in the rates of

COVID-19 spread, and the State has tightened restrictions when there were "spikes" of substantial

community transmission.  Ex. F, Crouch, ¶¶ 4-26; Ex. E, Marsh ¶ 9.  By national standards, West

Virginia has done well in controlling the spread and limiting the harm caused by this virus.[6]

The same philosophy undergirded the State's approach for reopening indoor bars at 50%

capacity on May 26, 2020.  *See* Ex. G, Exec. Order 40-20.  Two weeks later, on July 10, 2020, the

Monongalia County Health Department reported 456 total cases of COVID-19, which more than

doubled the total cases from the previous week.  *See* Ex. H, Dave Mistich, *Gov. Justice*

*Considering Closure of Mon County Bars, Indoor Dining as Area Sees Spike in Virus Cases*, West

Virginia Public Broadcasting (July 10, 2020), https://www.wvpublic.org/news/2020-07-10/gov-

---

[4] The affidavits of Dr. Marsh and Secretary Crouch were prepared for a similar case, *McLaughlin v. Governor Jim Justice, et al.,* No. 20-P-246 (Kanawha Co.), which challenged a different Executive Order in state court.  The affidavits are nevertheless helpful here.
[5] *See, e.g.*, Exec. Orders 32-20, 36-20, 37-20, 39-20, 40-20, 41-20, 42-20, 43-20, 44-20, 45-20, 49-20, 51-20.  Exs. G and I-S.
[6] *See* Ex. T,    *CDC COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#compare-trends_newcases (comparing the West Virginia's coronavirus rates with surrounding states and demonstrating that West Virginia has the lowest rate of spread in the region (last visited Oct. 19, 2020)).

justice-considering-closure-of-mon-county-bars-indoor-dining-as-area-sees-spike-in-virus-cases.

In response to patrons and employees testing positive for COVID-19, several bars and restaurants in Morgantown voluntarily closed.  *Id.*  As cases continued to spike, especially for individuals in the age range of 20 to 29, the Governor decided to close all bars in Monongalia County for 10 days.  *See* Ex. U, Exec. Order 52-20; Ex. V, Gabriella Brown, *Justice Shutters Bars in Mon County Due to COVID-19 Spike*, Daily Athenaeum (July 13, 2020), https://www.thedaonline.com/news/coronavirus/justice-shutters-bars-in-mon-county-due-to-covid-19-spike/article_b933588c-c446-11ea-be9c-030f0ca8a188.html.  The Governor continued to extend the bar closures in Monongalia County through 12:01 a.m. on August 31, 2020, after being regularly advised by West Virginia's public health experts on the current number and demographics of total COVID-19 cases in the county.  *See* Exec. Orders 55-20, 58-20, 60-20, 62-20. Exs. W-Z.

When the sun set on those executive orders, the bars in Monongalia County were given another window for reopening, beginning on August 31, 2020, with appropriate mitigation measures, such as limiting bar seating to 50% capacity, keeping six feet of distance between patrons of different groups at bar seating, allowing for six feet of space between tables, and not allowing patrons to congregate in waiting areas.  It took only two days for the bars and their patrons to demonstrate an inability to comply with those safety measures.  On September 1, 2020, photos circulated on social media showing large, tightly packed crowds of people without masks waiting in-line to get into various Morgantown bars, including Plaintiff Fat Daddy's for "Taco Tuesday." *See* Ex. AA (Photo of maskless people standing in line to get into a bar); *see also* Ex. BB (Almost Heaven Bar and Grill Suspension Order) (citing the bar for "obstructing the Governor's Orders"

and suspending its license for "disregard for the Licensee's patrons and the public's health and safety").

As part of the broad rebuke of this behavior, the President of West Virginia University wrote an open letter to the Morgantown and University communities explaining the undeniable truth: unsafe behavior puts everyone in jeopardy.[7]  On September 2, 2020, following the pictures of bars out of compliance, the Governor again decided to close bars in Monongalia County after finding that there has been "little to no social distancing in line for or within bars that have reopened, little to no wearing of face coverings in line for or within bars that have reopened, and little to no acknowledgement, by many patrons or establishments that have reopened, of the threat COVID-19 poses." Ex. DD, Exec. Order 65-20.  Validation of the Governor's actions did not take long.  On the heels of this brief reopening, Monongalia County reported 83 new COVID-19 cases on September 2, 2020, and September 3, 2020—the highest two-day count since mid-July.  *See* Ex. EE, John Raby, *W. Va. Closes College Town's Bars Amid Rising Virus Cases*, AP News (Sept. 2, 2020), https://apnews.com/1c0f19221d77dbcb6634d4e0ea706c2f. West Virginia University also reported on September 2, 2020, that 35 students tested positive for COVID-19, the highest number since mandatory testing began.  *Id.*

After this lawsuit was filed, the Governor issued Executive Order 75-20, which allowed bars in Monongalia County to "reopen in strict compliance with applicable guidance" and "terminated [Executive Order 65-20] in its entirety and without further effect."  *See* Ex. FF, Exec. Order 75-20 (Oct. 13, 2020).  Again, even after that Executive Order, some bars, including Plaintiff Joe Mama's, were "clearly not following COVID-19 guidelines."   Ex. GG, (Joe Mama's

---

[7] See Ex. CC, Gordon Gee, *Gatherings outside Morgantown Bars puts us all in jeopardy* (Sept. 2, 2020), https://wvutoday.wvu.edu/stories/2020/09/02/gee-gatherings-outside-morgantown-bars-put-us-all-in-jeopardy#:~:text=West%20Virginia%20University%20President%20Gordon,the%20campus%20and%20Morgantown%20communities.

Suspension Order).  More specifically, Joe Mama's main bar was "crowded with patrons and no social distancing [was] being practiced."  *Id.*  "[P]atrons were seated in close proximity," "walking to different areas of the facility without face coverings," and violating social distancing requirements.  *Id.*  And the bar was "not attempting to ensure social distancing and face coverings requirements were followed."  *Id.* The bar had "maybe 1 or 2 patrons with face coverings."  *Id.*  It was just another night.  But wishing for an alternate reality, unfortunately, does nothing to prevent the spread of a deadly disease.  This "disregard for the Licensee's patrons, staff and the public health and safety" resulted in the immediate suspension of Joe Mama's license.  *Id.*

I.    **The Court lacks subject matter jurisdiction to consider the Plaintiffs' claims because they are moot, and the broad powers vested in the Governor during a state of emergency are not subject to judicial review.**

A.    **The broad powers vested in the Governor by statute and the State Constitution deprive this court of jurisdiction to review facially constitutional orders.**

This Court does not possess jurisdiction to consider and second guess the Governor's reasonable executive orders made under the emergency powers because they are discretionary and within the limits of his constitutional powers and privileges. When State officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U. S. 417, 427 (1974). "[W]here those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–1614 (2020) (C.J., Roberts concurring); *see also Garcia v. San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545 (1985). "All agree that the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts." *League of*

*Independent Fitness Facilities and Trainers, Inc. v. Whitmer*, 814 Fed. Appx. 125 (6th Cir. June 24, 2020).

The courts have recognized the bedrock limitations for well-over over a century. "The office of Governor is political, and the discretion vested in the chief executive by the Constitution and laws of the state respecting his official duties is not subject to control or review by the courts." Syl., *Hatfield v. Graham*, 81 S.E. 533 (W. Va. 1914).  Because the State "Constitution and laws of the state vest in [the Governor] certain powers and duties, and he is necessarily clothed with the right to determine what his duties are in any emergency; and, so long as he acts within the limits of his constitutional powers and privileges, his official conduct is not subject to review in any other manner than that provided by the Constitution which created his high office." *Id.* at 535.  During states of emergency, "the courts have been very careful to observe the line of demarcation separating the jurisdiction of the executive from the judiciary."  *Id.* at 538.To undermine the Governor's constitutional discretionary authority as Plaintiffs request would violate the separation of powers by allowing the courts to usurp powers expressly reserved to the executive branch by the Constitution and the Legislature  in a  time of crisis.

During an emergency, the "necessity for the act is its justification, and the Governor ha[s] the discretion to determine whether the necessity therefor existed, and, having had cause to believe that the necessity did exist, the courts have no power to review his discretion and pronounce his warrant or command unlawful, as being in excess of his constitutional power."  *Id.* at 536.  "The necessity for his act makes it both lawful and 'due process' within the meaning of the Constitution of the United States."  *Id.* (citing *Moyer v. Peabody*, 212 U.S. 78 (1909)).  Fundamentally, the "Governor cannot be held to answer in the courts in an action for damages resulting from carrying out his lawful orders issued in good faith in discharge of his official duties."  Syl., *Hatfield*, 73 W.

Va. 759, 81 S.E. at 533.   Even the Plaintiffs cannot—and do not—seriously challenge the underlying necessity and purpose behind the Governor's acts at issue here or that they were not discharged in good faith.

Yet, the Plaintiffs ask the Court to abrogate several Executive Orders that the Governor is entitled to make under West Virginia law.   In the Emergency Powers Act, the West Virginia legislature vested the Governor with broad authority during a state of emergency.   *See* W. Va. Code. § 15-5-6.   In his discretion, the Governor may "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business" and "exercise other functions, powers and duties that are necessary to promote and secure the safety and protection of the civilian population."   *Id.* § 15-5-6(c)(7), (11).   Especially relevant, the Governor has direct statutory authority to "suspend or limit the sale, dispensing or transportation of alcoholic beverages."   *Id.* 15-5-6(c)(9).   In addition to ignoring this authority, the Plaintiffs simply fail to allege that the temporary executive orders were not necessary to slow the spread of COVID-19, that the interests of the public did not require such intervention, or that the means used were not reasonably necessary to accomplish that purpose.   *See, e.g.*, *Benner v. Wolf*, No. 20-CV-775, 2020 WL 2564920, at *6 (M.D. Pa. May 21, 2020) (denying a similar challenge to the Governor's response to the COVID-19 pandemic because of the broad police powers and for the same pitfalls the Plaintiffs stumble into here).

A more granular view exposes the Plaintiffs' claims for the outlier they are because of the particular business they are in.   Regarding the regulation and control of the sale of alcohol and beer, "[i]t is well-settled law in West Virginia  that the State's police power is broad and sweeping and this power may be delegated, within limits, by the Legislature to the executive branch to enact rules and regulations to protect the welfare, safety, and health of the public."   *CDS, Inc. v. Camper*,

189 W. Va. 63, 428 S.E.2d 44, 46 (1993).  The West Virginia legislature delegated state police powers to the Alcohol Beverage Control Commissioner "to regulate and control the manufacture, sale, distribution, transportation, storage and consumption of alcoholic liquors and at the same time to assure the greatest degree of personal freedom consistent with the health, safety, welfare, peace and good morals of the people of this state."  W. Va. Code. § 60-1-1; *see also id.* § 11-16-2 (The regulation and control of the sale, distribution, and consumption of alcoholic beverages is a "valid exercise of the police powers of this state and are intended for the protection of the public safety, welfare, health, peace and morals.").  "Because licenses to sell beer and operate a private club are not property rights but are privileges granted by the state for a specified time, license applicants must meet the statutory guidelines and the Commissioner's rules and regulations." *Camper*, 428 S.E.2d at 47.  Thus, actions of the Alcohol Beverage Control Commissioner to regulate licensees with respect to public safety, welfare, health, peace and morals during the Governor's declared state of emergency is appropriate and the duty of the Commissioner, whether in Monongalia County or any other county in the State.

Taking a step back, the U.S. Supreme Court has recognized that courts should take a deferential approach when evaluating a state's emergency actions during a public-health crisis. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  In *Jacobson*, the Supreme Court explained that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26. While federal courts must "guard with firmness every right appertaining to life, liberty or property as secured to the individual by the supreme law of the land," they "should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law." *Id.* at 38. "Accordingly, when faced with an epidemic of disease threatening the safety of the people, federal

courts review the constitutionality of state emergency measures only for whether they have 'no real or substantial relation to those objects' or are 'beyond all question, a plain, palpable invasion of rights secured by the [Constitution].'" *Village of Orland Park v. Pritzker*, No. 20-cv-03528, 2020 WL 4430577, at \*7 (N.D. Ill. Aug. 1, 2020) (citing *Jacobson*, 197 U.S. at 31). Because the Governor's restrictions on Monongalia County bars has a substantial relation to protecting the health and safety of the community and do not constitute a constitutional violation, as discussed in further detail below, the federal courts must stop their analysis there and give deference to the State's emergency powers.

This fundamental jurisdictional limitation on reviewing the Governor's decisions—and the implementation of those decisions by State agencies—in emergency situations is consistent with other challenges to the discretionary authority of state actors.  For example, in West Virginia, "a citizen and taxpayer may maintain a mandamus proceeding to compel any public officer to perform a *nondiscretionary* legal duty."  Syl. Pt. 1, *State ex rel. Brotherton v. Moore*, 159 W. Va. 934, 934, 230 S.E.2d 638, 639 (1976) (emphasis added).  That is not so, however, for discretionary acts such as executive orders made pursuant to the Governor's emergency powers.  *See State ex rel. Brown v. Corp. of Bolivar*, 217 W. Va. 72, 79, 614 S.E.2d 719, 726 (2005) (recognizing that responsibilities of "discretionary nature, would not be the proper subject of a writ of mandamus").  The Governor's reasonable actions and executive orders made under the emergency powers statute are clearly discretionary and not subject to review.

Importantly, although the Courts do not have jurisdiction to review the Executive's facially constitutional actions during an emergency, the Governor does not go unchecked.  "[W]herever, within the sphere of his duties, the executive has a discretion, he is amenable for refusing to perform them, not to the court, but to the Senate on an impeachment, or to the people at the polls."

12

*Id.* (quoting *Mauran v. Smith*, 8 R.I. 192, 5 Am. Rep. 546 (1865)).  Alternatively, if the Legislature believes the Governor has gone too far or even simply disagrees with his approach as a matter of policy, it has full and independent authority to demand a special legislative session, to invalidate the Governor's COVID-19 executive orders through legislation, and even to end the state of emergency altogether.  *See* W. Va. Code § 15-5-6(b); W. Va. Const. art. XI § 19; *Baker v. Civil Serv. Comm'n*, 161 W. Va. 666, 672, 245 S.E.2d 908, 911 (1978) (holding that a statute effectively voiding executive order did not violate separation of powers).  Finally, nothing in the Emergency Powers Act allows a Governor to take actions during a state of emergency that blatantly violate the constitutional rights of West Virginia residents, and courts would have jurisdiction to consider and decide claims that the Governor has done so.  But conclusory invocations of the constitution hardly suffice as a basis to invoke the Court's jurisdiction in every instance.  For the Court to even consider Plaintiffs' claims would upset the federal-state balance and invade the province of separate state branches of government.

**B.  The relief that Plaintiffs seek from the Executive Orders issued in 2020 by the Governor, including Executive Order 65-20, is moot, and the voluntary cessation exception to the mootness doctrine does not apply.**

In their motion for a preliminary injunction, Plaintiffs request that the Court issue a preliminary injunction requiring the Governor to cease enforcement of all Executive Orders that "have been issued or have become effective in 2020 because of Covid-19" and have limited the operation of bars and restaurants in Monongalia County.  Pl.s' Mot. 3.  However, Plaintiffs' request for relief is now moot after the relevant Executive Orders have been terminated because "the dispute is no longer embedded in any actual controversy about the [P]laintiffs' particular legal rights."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  Courts have recognized, "however, that a defendant cannot automatically moot a case simply by ending its [alleged] unlawful conduct

once sued." *Id.* This exception, commonly known as the voluntary cessation exception, applies unless it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (internal quotations omitted).

Here, to the extent that Plaintiffs' motion for a preliminary injunction seeks an order enjoining the Governor from enforcing Executive Order 65-20, Ex. DD, and related orders causing Plaintiffs' bar establishments to close, these requests are moot as the Governor has now lifted the restrictions on the bars in Monongalia County under Executive Order 75-20, Ex. FF. Bars in Monongalia County are now able to open while following West Virginia's health and safety guidelines in response to COVID-19. The voluntary cessation exception does not apply in this case because Plaintiffs cannot demonstrate that the Governor will issue another Executive Order closing bars in Monongalia County. Although COVID-19 cases could again surge in Monongalia County, Plaintiffs cannot say that it is "absolutely clear" that one will occur, and if one does occur, that the Governor will issue the same or similar Executive Order closing all bars in Monongalia County.

## II.    Even if the Court had jurisdiction to consider their claims, Plaintiffs fail to make a clear showing on any of the four prongs of the preliminary injunction test.

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), as amended (Jan. 14, 2020) (internal quotation marks omitted). In determining whether the extraordinary remedy of a preliminary injunction is appropriate, Plaintiffs "must establish [1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Plaintiffs fail on all four fronts.

### A.  Plaintiff's claims are likely to fail on the merits.

Plaintiffs are likely to fail on the merits for each of the following claims brought against the Governor: (1) violation of separation of powers under the West Virginia constitution; (2) violation of separation of powers under the United States Constitution; (3) denial of substantive due process under the United States Constitution; (4) denial of procedural due process under the United States Constitution; (5) unlawful takings without just compensation under the United States Constitution; and (6) violation of equal protection under the United States Constitution.

### 1.  Separation of Powers Under the West Virginia Constitution

Plaintiffs' claims under the West Virginia constitution fail because "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984); *see also Tigges v. Northam*, No. 3:20-cv-410, 2020 WL 4197610, at *5 (E.D. Va. July 21, 2020) (holding that the court cannot enjoin the Governor from enforcing the Executive Orders on the basis of state law); *Talleywhacker, Inc. v. Cooper*, No. 5:20-cv-218-FL, 2020 WL 3051207, at *12 (E.D.N.C. June 8, 2020) (holding same).  Since Plaintiffs do not offer any applicable exception to the Eleventh Amendment bar of their state law claims, the Eleventh Amendment prevents the Plaintiffs from succeeding on the merits for their state law claims. Moreover, for one set of Plaintiffs in one Court to derail the swift, concerted efforts of the Governor and various State agencies would cause irreparable harm to the Respondents by upending settled precedent, contravening the separation of powers, and restricting the Government's ability to respond to future crises. *See Hatfield*, 73 W. Va. 759, 81 S.E. at 535. To do so, the Court would usurp the powers expressly vested in the Governor by the State Legislature and the State Constitution.

## 2.   Separation of Powers Under the U.S. Constitution

Plaintiffs argue that the Governor's Executive Orders constitute a violation of the separation of powers principle under the U.S. Constitution as well as a violation of the guarantee of a republican, or representative, form of government.   As explained above, there is no separation of powers violation when the Governor exercises the authority granted to him by the State Legislature, and it would violate separation of powers principles for the federal judiciary to usurp the authority granted to the state executive.   Moreover, "the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019); *see also McCarthy v. Cuomo*, No. 20-cv-2124 (ARR), 2020 WL 3286530, at *6 (E.D.N.Y. June 18, 2020) (holding Plaintiffs' argument that COVID-19 Executive Orders constitute a violation of the separation of powers principle is not cognizable).   Since there is no legal basis for this claim, it is likely to fail on the merits.

## 3.   Procedural Due Process Under the U.S. Constitution

Plaintiffs are unlikely to succeed on their procedural due process claim because the Plaintiffs have failed to identify a constitutionally cognizable life, liberty, or property interest.   "To succeed on a procedural due process claim, a plaintiff must . . . [f]irst . . . demonstrate that he had a constitutionally cognizable life, liberty, or property interest." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).   "The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).   However, "business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense." *Id.*; *see also In re Premier Auto. Serv., Inc.*, 492 F.3d 274, 283 (4th Cir. 2007) ("The recognition of such a broad

'right to do business' would be akin to that recognized in *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), and its progeny, which the Supreme Court has long since refused to recognize.").

Of equal importance, a "license to sell beer or operate a private club is not a property right but is a privilege granted by the State to an individual." *See West Virginia Nonintoxicating Beer Com'r v. A & H Tavern*, 181 W. Va. 364, 382 S.E.2d 558 (1989).[8]  The Supreme Court of West Virginia has explained, "there is no inherent right in any individual to engage in business which the state, in exercise of police power, has placed under surveillance and permits only as privilege or franchise." *CDS, Inc. v. Camper*, 189 W. Va. 63, 428 S.E.2d 44 (1993).   Because the opportunity to operate a private club or tavern is a privilege granted via license that may be revoked, it hardly amounts to a liberty or property interest.  *See* W. Va. Code § 60-7-13; 175 CSR 2 §§ 6.1., 6.7.3.

Here, the only interest that Plaintiffs contend that the Governor infringed upon was "their right to do business."  Pl.s' Mot 8.  But Plaintiffs have no "right" to a license to operate a private club or tavern, and the "right to do business" has not been recognized as a constitutionally protected right.  The Plaintiffs point to no contrary authority.  Their claims also ignore the grave nature of *why* the Governor issued a state of emergency and the specific authority vested in the executive during emergencies to "suspend or limit the sale, dispensing or transportation of alcoholic beverages."  *See* W. Va. Code § 15-5-6 (c)(9).  For these reasons, Plaintiffs' procedural due process claim is likely to fail on the merits.

---

[8] Pursuant to 176 CSR 1 §3.1, "Each person seeking a license to manufacture, sell, possess for sale transport or deliver nonintoxicating beer in the state of West Virginia must first be licensed."  *See also* W. Va. Code § 60-7-3 (authorizing the sale of alcohol by licensees); *id.* § 11-16-5 (requiring a license to sell beer); W. Va. Const. Art. VI, § 46 ("The Legislature shall by appropriate legislation regulate the manufacture and sale of intoxicating liquors.").

### 4.  Substantive Due Process Under the U.S. Constitution

Plaintiffs are unlikely to succeed on their substantive due process claim.  To succeed on a substantive due process claim, Plaintiffs must first establish that they "possessed a cognizable property interest, rooted in state law."  *Siena Corp. v. Mayor & City Council of Rockville Maryland*, 873 F.3d 456, 461 (4th Cir. 2017).  If Plaintiffs establish that they possessed a property interest, they must also demonstrate that the state deprived them of their property interest and "the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency."  *Sylvia Dev. Corp. v. Calvert Cty. Md.*, 48 F.3d 810, 827 (4th Cir. 1995).  As discussed above, the assertion of a general "right to do business" is not a constitutionally protected right or property interest rooted in state law.  Even if the Plaintiffs could demonstrate that they possessed a cognizable property interest, the Governor's actions involve a legitimate governmental purpose, and the Governor possesses broad authority to protect the health and safety of the community during an epidemic.

### 5.  Unlawful Takings Without Just Compensation Under the U.S. Constitution

The Takings Clause claim is unlikely to succeed on the merits because the executive orders do not limit all of Plaintiffs' economic activity; rather those orders simply limit *how* the businesses can conduct operations in the midst of a pandemic. The Governor assumes that Plaintiffs allege a regulatory taking and not a physical taking, as the government has not physically possessed Plaintiffs' businesses. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Plaintiffs' regulatory taking claim is fails because the Governor's Executive Orders do not "den[y] all economically beneficial or productive use of land." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017).  Where a regulation does not deny all economically beneficial use of the property, courts weigh the following factors to determine if a taking still may be found: "(1) the economic impact

of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943.

Executive Order 65-20 did not deny all economically beneficial use of Plaintiffs' properties.  For example, Plaintiffs could, and many did, offer food or beverages for take-out, which was specifically recognized in the Governor's Executive Order 65-20. Ex. DD.  As is their freedom, many of the Plaintiffs do not meet or barely meet the kitchen and food requirements set forth in the West Virginia Code and rules, so they were not able to meet the indoor dining capacity requirements as set forth in Executive Order 40-20, Ex. G, which authorized indoor and take away dining options on May 22, 2020.  Many months later, some of the Plaintiffs did decide to meet county health permit requirements and provide some type of basic edible food for dining (e.g., tacos, hot dogs, and soft pretzels).  Thus, if Plaintiffs lost all income, "that is a result of a voluntary choice not to pursue alternative business models that would allow the business to remain open while complying with the regulation." *McCarthy*, 2020 WL 3286530, at *5.  Moreover, it was the businesses' own failures in early September to comply with and enforce the safety requirements set forth for reopening which caused their subsequent, and now temporary, closure.

Finally, the character of the governmental action was taken in response to an unprecedented global health pandemic, and the government took only those steps necessary in its judgment to prevent large increases in the community spread of COVID-19 and weigh the varying public interests at issue, including those of the Plaintiffs. Those risks did, in fact, justify the earlier closure of these businesses.  The subsequent reopenings reflect the difficult balancing decisions the Executive Branch has had to make, as greater understanding of COVID-19 and measures which can limit its spread have developed.

### 6.  Equal Protection Under the U.S. Constitution

The Plaintiffs do not include equal protection arguments in their motion for a preliminary injunction, but they do allege such a claim in their Amended Complaint. An Equal Protection claim, however, is unlikely to succeed on the merits.  The Fourteenth Amendment prevents any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  "The Clause requires that similarly-situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  "In evaluating an equal protection challenge to a rule, courts must first determine the standard of review to apply.  If the rule neither infringes a fundamental right nor disadvantages a suspect class, courts apply rational basis review." *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Lynch*, 826 F.3d 191, 196 (4th Cir. 2016) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  "[A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012).

Plaintiffs have not identified a violation of a fundamental right or reliance on a suspect classification that would entitle them to any heightened review.  As discussed above, "the regulation of business operations does not 'impinge on fundamental rights.'" *Talleywhacker, Inc. v. Cooper*, No. 5:20-CV-218-FL, 2020 WL 3051207, at *9 (E.D.N.C. June 8, 2020).  To the extent the Plaintiffs have identified a class of similarly situated persons who are being treated differently, Plaintiffs' equal protection claim is likely to fail on the merits because Plaintiffs are unable to demonstrate that the Governor's Executive Orders do not have a rational basis.  First, allegations that bars and restaurants outside of Monongalia County are a similarly situated class fail.  The

20

circumstances in Monongalia County—the city of Morgantown, specifically—are different than anywhere else in the State of West Virginia because of the presence of West Virginia University and its population of almost 27,000 students.  Yet, even if bars in Monongalia County were similarly situated to those in the rest of the State, the Governor's executive orders focused on the bars in Monongalia County are rationally related to the public health and welfare due to such a high student population and the density of bars in the County.

The Governor's Executive Orders implemented to prevent the spread of COVID-19 have a legitimate governmental purpose because "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905).  This legitimate governmental purpose is rationally related to the treatment of bars in Monongalia County because the Governor issued the Executive Orders based on the advice of West Virginia's public health experts in response to high numbers of new COVID-19 cases in Monongalia County and the higher population density.  As every citizen of West Virginia knows, Morgantown and West Virginia University are unique. Further, the Governor and West Virginia's public health experts concluded that bars in Monongalia County were not adhering to social distance guidelines as some of the Plaintiffs to this suit have demonstrated. Ex. GG, (Joe Mama's Suspension Order).

**B.  Plaintiffs' alleged harm is not irreparable and is not supported by evidence.**

Plaintiffs do not assert or support with evidence any irreparable harm caused by the Governor's Executive Orders.  First, Plaintiffs claim that they are irreparably harmed by receiving no income from operations.  Pl.s' Mot. 9.  Economic harm is not irreparable because "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" for the Court to enter a preliminary injunction.  *Sampson v.*

*Murray*, 415 U.S. 61, 90 (1974).  Moreover, the Fourth Circuit has held that "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable."  *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Plaintiffs' argument is further weakened by the fact that bars in Monongalia County are now able to reopen for in-person business, and throughout the response they could be open for takeout food and beverages.

Second, Plaintiffs claim that "inability to earn income while still incurring expenses to third parties" puts Plaintiffs "in danger of financial ruin."  Pl.s' Mot. 9.  Although "irreparable harm may still exist where the moving party's business cannot survive absent a preliminary injunction," *id.*, Plaintiffs do not properly support their claim of irreparable harm.  Plaintiffs have failed to submit any evidence or affidavits to support their bare assertion.  Again, Plaintiffs are now able to reopen their businesses if they just follow the guidelines. *But see* Ex. GG, (Joe Mama's Suspension Order).

### C. The balance of the equities and the public interest factors weigh against entry of a preliminary injunction.

The Fourth Circuit has observed that "assessing harm to the opposing party and weighing the public interest 'merge' when the government is the party opposing a stay."  *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In times of emergency, the Governor, whoever he or she may be, must act swiftly to protect the interests of the people in our State.  It is difficult to imagine a context where swift and broad action is more important than responding to a public health crisis the likes of which the world hasn't seen in over a century.  Time is of the essence and lives are at stake.  A single look at the Governor's COVID-19 response website reveals the  daily efforts taken to respond to and provide

guidance for the myriad aspects of our society affected by the pandemic.[9]  The West Virginia plan specifically demonstrates that the Governor does not seek to unnecessarily limit business like bars in Monongalia County but, rather, seeks to safeguard the health and safety of the community while allowing the businesses to operate.  *See* Ex. G, Exec. Order 40-20 (allowing indoor bars to open with 50% capacity); *see also* Ex. HH, *A Guide to Safely Opening Restaurants and Bars*.  For Plaintiffs to ask this Court to second-guess or curtail the Executive Branch's efforts now would set a dangerous precedent with far-reaching effects on the State's ability to effectively respond to new developments in this and future emergencies.

Plaintiffs spend scant space in their brief on the public interest, which is understandable because it is so harmful to their position.  There is no public interest in attending bars like we are not dealing with a pandemic, especially in counties experiencing surges of new COVID-19 cases. Doing so will only increase the spread of COVID-19, endangering not only the bar attendees but also their families and friends and the health care institutions in Morgantown which have to take care of the virus' victims. *See AJE Enter. LLC, et al. v. Justice et al*, No. 1:20-cv-229 (Oct. 19, 2020) ECF No. 19 (Ex. Nos. 6, 7, 19).  A vaccine is estimated to be developed within the next year, and new therapeutics to help with the treatment of those who catch the virus seem to be announced every couple of weeks.  As new resources, technology, and information come available, the Governor and the Secretary can adjust the State's COVID-19 response when appropriate.  Ex. F, Crouch, ¶ 27.

In short, despite challenging circumstances, West Virginia has fared relatively well in response to this pandemic under the Governor's Executive Orders and with the actions taken by the WVDHHR and the National Guard, among others.  The public interest will be best served by

---

[9]  Office of the Governor, Jim Justice, *West Virginia's Response to COVID-19*, https://governor.wv.gov/Pages/WV-COVID-19-actions-and-executive-orders.aspx (Sept. 20, 2020).

keeping it that way.  If all of us will accept our individual responsibility to wear our masks, wash our hands, avoid crowds, get tested, and adhere to the guidance from the Governor, the WVDHHR, the ABCA, and the other agencies responsible for our health and safety, West Virginia can reduce its rate of COVID-19 infection, reduce the numbers of hospitalizations and deaths, and ultimately resume the activities — including attending restaurants and bars — in the less-restricted ways we took for granted before March.  The injunction Plaintiffs seek will only delay and complicate achieving that goal, which the public so devoutly desires.

<b>Conclusion</b>

Respectfully, for all the foregoing reasons, the relief sought by Plaintiffs should be denied and their Complaint dismissed with prejudice.

Respectfully submitted:

**James Justice, in his capacity as Governor of West Virginia; Fredric L. Wooton, in his capacity as the West Virginia Alcohol Beverage Control Administration Commissioner**

By Counsel

*/s/ Benjamin L. Bailey*
Benjamin L. Bailey (WVSB #200)
Benjamin J. Hogan (WVSB #12997)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555 (telephone)
(304) 342-1110 (facsimile)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AJE ENTERPRISE LLC d/b/a
WHISPER NIGHT CLUB AND LOUNGE;
ADAM EREDITARIO;**

**BITS LLC d/b/a FAT DADDY'S;
BRIANA WEISEN;**

**DRD2 LLC d/b/a ALMOST HEAVEN
BAR & GRILL;
DANIELLE DUFALLA;**

**BABY SQUIRRELS, LLC;
BABY SQUIRRELS SALOON;
TRAVIS TRACY;**

**B.F. UGLY'S d/b/a BIG TIMES;
ALIAS ENTERPRISES, LLC d/b/a CODE;
ZACH TRAUGH;**

**CARIBBA FOODS, LLC d/b/a CRAB SHACK
CARIBBA AND DOCKSIDE GRILLE;
BRON KAYAL;**

**CECELIA'S d/b/a JOE MAMA'S;
JOE BLODGETT;**

**EXTENSIVE ENTERPRISES;
KENNETH DUFALLA;**

**MOUNTAIN MAMAS HOT SPOT LLC;
MOUNTAIN MAMAS TAVERN LLC;
MEGAN AND JACOB SAMPLES;**

**SAR TECH LLC AND SHC LLC;
STEVE REESE;**

**JL3 LLC;
THE ANNEX;
CHRIS HARE;**

**RAY G 4TH AND GOAL d/b/a 4TH & GOAL;
RAY G SCORERS d/b/a SCORERS;
RAY GLYMPH;**

**NUT CLUB LLC d/b/a BLAZE; and
MAXWELL CUMMONS,**

        **Plaintiffs,**

**v.**                            **CIVIL ACTION NO. 1:20-Cv-229
Judge John Preston Bailey**

**JAMES JUSTICE, in his capacity as
Governor of West Virginia; FREDRIC
L. WOOTON, in his capacity as the West
Virginia Alcohol Beverage Control Administration
Commissioner; THE CITY OF MORGANTOWN;
EMILY MUZZARELLI, in her capacity as the
Interim City Manager of Morgantown,**

        **Defendants.**

## CERTIFICATE OF SERVICE

I, undersigned counsel, do hereby certify that the foregoing **Response of Defendants Governor Justice and the West Virginia Alcohol Beverage Control Administration in Opposition to Plaintiffs' Motion for Preliminary Injunction** was served upon counsel of record this 19th day of October 2020, through the CM/ECF System, which will notify the following CM/ECF participants:

| | |
|---|---|
| Martin P. Sheehan | John R. Hoblitzell |
| SHEEHAN & ASSOCIATES | Kay, Casto & Chaney, PLLC |
| 1 Community Street, Suite 200 | PO Box 2031 |
| Wheeling, WV 26003 | Charleston, WV 25327 |
| sheehanbankruptcy@wvdsl.net | jhoblitzell@kaycasto.com |
| *Counsel for Plaintiffs* | |
| | Ryan Patrick Simonton |
| | Kay, Casto & Chaney, PLLC |
| | 150 Clay Street, Suite 100 |
| | Morgantown, WV 26501 |
| | rsimonton@kaycasto.com |
| | *Counsel for the City of Morgantown* |
| | *and Emily Muzzarelli as her capacity as the* |
| | *Interim City Manager of Morgantown* |

                                */s/ Benjamin L. Bailey*
                                Benjamin L. Bailey (WVSB #200)